**ENVIRONMENTAL DEFENSE FUND, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and Lee M. Thomas, Administrator, Respondents,**

Aluminum Association, Incorporated, American Mining Congress, Idaho Mining Association, and Kennecott, Intervenors.

**HAZARDOUS WASTE TREATMENT COUNCIL, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and Lee M. Thomas, Administrator, Respondents,**

American Mining Congress, the Fertilizer Institute, and Aluminum Association, Inc., Intervenors.

Nos. 86–1584, 86–1691.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1987.

Decided July 29, 1988.

As Modified on Denial of Rehearing Aug. 23, 1988.

As Modified Oct. 12, 1988.

Robert V. Percival, Washington, D.C., for Environmental Defense Fund, and David R. Case, Washington, D.C., for Hazardous Waste Treatment Council, with whom Alan S. Miller, Washington, D.C., Debra Hirshkowitz (student counsel) and Jan Wagner (student counsel) were on the brief, for petitioners.

Margaret B. Silver, Atty., E.P.A., with whom Scott A. Schachter, Atty., Dept. of Justice and Roger J. Marzulla, Acting Asst. Atty. Gen., Washington, D.C., were on the brief, for respondents.

John N. Hanson, with whom, Donald J. Patterson, Jr.; Edward M. Green, Washington, D.C., Roderick T. Dwyer, for American Mining Congress; Richard A. Flye,

Christian Volz, Carole Stern, Washington, D.C., for The Fertilizer Institute; Alan S. Ward, Jeffrey S. Holik, Washington, D.C., for Aluminum Ass'n, Inc.; Alfred V.J. Prather, Kurt E. Blase, Washington, D.C., for Kennecott; and Robert M. Tyler, Jr., Boise, Idaho, for Idaho Mining Ass'n, were on the joint brief for intervenors American Mining Congress, et al. William R. Baker, III and Adrienne S. Wieand, Washington, D.C., also entered appearances for intervenor Aluminum Association, Inc., in No. 86–1691.

Before MIKVA and BUCKLEY, Circuit Judges, and OBERDORFER[*], District Judge.

Opinion for the Court filed by District Judge OBERDORFER.

OBERDORFER, District Judge:

In these consolidated cases, petitioners Environmental Defense Fund ("EDF") and Hazardous Waste Treatment Council ("HWTC") seek review of a final decision by the Administrator of the Environmental Protection Agency ("EPA" or "the Agency") withdrawing a proposed reinterpretation of the mining waste exclusion contained in section 3001(b)(3)(A)(ii) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6921(b)(3)(A)(ii). That section, known as the "Bevill Amendment," suspends certain mining wastes from regulation under the provisions governing hazardous waste treatment and disposal contained in Subtitle C of RCRA. 42 U.S.C. §§ 6921–6931. The EPA's proposed reinterpretation of the Bevill Amendment was published in the Federal Register on October 2, 1985. 50 *Fed.Reg.* 40,292 (1985). The Agency's final action withdrawing the proposed reinterpretation was published on October 9, 1986. 51 *Fed.Reg.* 36,233 (1986).

Based on a careful review of the EPA's decision and the arguments advanced by the parties, we conclude that the EPA's decision to withdraw the proposed reinterpretation in its entirety without seeking additional time to refine it was arbitrary and capricious and contrary to law because it left six hazardous smelter wastes unregulated under Subtitle C and reinstated an overbroad interpretation of the Bevill Amendment. Accordingly, we grant the petition for review and order EPA to relist six hazardous smelter wastes and complete the rest of its statutory responsibilities under Subtitle C of RCRA.

## I. BACKGROUND

Congress enacted the Resource Conservation and Recovery Act in 1976. Pub. L.No. 94–580, 90 Stat. 2795. Subtitle C of RCRA, 42 U.S.C. §§ 6921–6931, established a comprehensive "cradle to grave" regulatory scheme governing the treatment, storage, and disposal of hazardous wastes. Section 3001(a) of RCRA, 42 U.S.C. § 6921(a), directs EPA to promulgate regulations identifying the characteristics of hazardous waste and listing particular hazardous wastes which would be subject to regulation under Subtitle C. In promulgating those regulations, EPA was directed to take into account criteria including "toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics." 42 U.S.C. § 6921(a). Section 3004 of RCRA, 42 U.S.C. § 6924, directs EPA to promulgate standards required of facilities engaged in the treatment, storage, and disposal of hazardous waste.

Subtitle D of RCRA, 42 U.S.C. §§ 6941–6949, also enacted in 1976, addresses solid wastes that are not hazardous. Under Subtitle D, states develop solid waste management plans that are based on federal guidelines and are submitted to EPA for approval. 42 U.S.C. §§ 6942–6947.

Section 8002(f) of RCRA, 42 U.S.C. § 6982(f), directs the EPA to conduct a comprehensive study of the adverse environmental effects of "solid wastes from active and abandoned surface and underground mines," including examination of

---

[*] Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

alternative methods of disposal to mitigate adverse environmental effects.

On December 18, 1978, EPA proposed regulations to govern the management of hazardous wastes under RCRA Subtitle C. 43 *Fed.Reg.* 58,946 (1978). EPA proposed to subject certain "special wastes," which were generated in "very large volumes" but were thought to pose "relatively low" hazards, to fewer regulatory requirements than other hazardous wastes because they were regarded as "not amenable to the control techniques" proposed for hazardous waste treatment, storage, and disposal. *Id.* at 58,992. Wastes from the "extraction, beneficiation, and processing of ores and minerals" were classified as "special wastes." *Id.* at 59,016. Other "special wastes" included cement kiln dust waste, utility waste such as bottom ash waste and fly ash waste, waste from phosphate mining such as overburden and slag, overburden and waste rock from uranium mining, and gas and oil drilling muds and oil production brines. *Id.* at 58,991, 59,015–16. EPA noted that it had "very little information on the composition, characteristics, and the degree of hazard posed by these wastes ...." *Id.* at 58,991.

On May 19, 1980, EPA promulgated final regulations identifying the characteristics of hazardous waste, and listing specific hazardous wastes as subject to Subtitle C regulation. The "special wastes" concept was not included in the final regulations, however, because EPA had revised its criteria for defining hazardous waste and thus expected fewer of the "special wastes" to be classified as hazardous and because the promulgated management standards were more flexible than those originally proposed in 1978. 45 *Fed.Reg.* 33,174 (1980).

The final regulations were to take effect on November 19, 1980. *Id.* at 33,084. Among the wastes listed in these regulations as hazardous and thus subject to regulation under Subtitle C were three hazardous waste streams from primary metal smelting operations, namely, copper blowdown wastes, lead impoundment solids, and zinc wastewater sludges. *Id.* at 33,124.

Three more hazardous wastes from metal smelting operations were listed on July 16, 1980, including spent potliners from primary aluminum reduction ("aluminum potliners"), and emission control dust or sludge from the production of ferrochromium and ferrochromium-silicon. 45 *Fed. Reg.* 47,832–34 (1980). EPA determined that these wastes "pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of or otherwise managed." *Id.* at 47,832.

*The Bevill Amendment*

On October 21, 1980, just before the Subtitle C regulations were to take effect, Congress enacted the Solid Waste Disposal Act Amendments of 1980, Pub.L.No. 96–482, 94 Stat. 2334, which included the "Bevill Amendment," named after its sponsor Congressman Bevill of Alabama. The Bevill Amendment added two key provisions to RCRA. First, in addition to extending the deadline on the study of mining wastes required by § 8002(f) of RCRA, it added § 8002(p) which required the EPA to conduct a comprehensive study of the adverse environmental and health effects, if any, of "the disposal and utilization of solid waste from the extraction, beneficiation, and processing of ores and minerals, including phosphate rock and overburden from uranium mining." 42 U.S.C. § 6982(p). The EPA was also directed to study the adverse health and environmental effects of several other types of wastes characterized as "special wastes" by EPA in 1978, including fly ash waste, bottom ash waste, slag waste, and cement kiln dust waste. *Id.* §§ 6982(n), (o). The studies were to be completed by October 21, 1983. The § 8002(p) study of wastes from "the extraction, beneficiation, and processing of ores and minerals" was to include an analysis of:

(1) the source and volumes of such materials generated per year;

(2) present disposal and utilization practices;

(3) potential danger, if any, to human health and the environment from the disposal and reuse of such materials;

(4) documented cases in which danger to human health or the environment has been proved;

(5) alternatives to current disposal methods;

(6) the costs of such alternatives;

(7) the impact of those alternatives on the use of phosphate rock and uranium ore, and other natural resources; and

(8) the current and potential utilization of such materials.

42 U.S.C. § 6982(p).

Second, the Bevill Amendment required EPA to defer, until at least six months after completion of the studies, the imposition of Subtitle C regulation on "[s]olid waste from the extraction, beneficiation, and processing of ores and minerals" and on several other categories of waste including fly ash waste and cement kiln dust waste. 42 U.S.C. § 6921(b)(3)(A). However, not later than six months after the study of mining wastes was completed, EPA was required to determine whether regulation of those wastes under Subtitle C of RCRA was warranted. In the words of the statute:

> the Administrator shall, after public hearings and opportunity for comment, either determine to promulgate regulations under this subchapter for ... [wastes from the extraction, beneficiation, and processing of ores and minerals] or determine that such regulations are unwarranted. The Administrator shall publish his determination, which shall be based on information developed or accumulated pursuant to such study, public hearings, and comment, in the Federal Register accompanied by an explanation and justification of the reasons for it.

42 U.S.C. § 6921(b)(3)(C).

In order to incorporate the Bevill Amendment's exclusion of mining wastes from regulation under Subtitle C, EPA published an amendment to its hazardous waste regulations on November 19, 1980. 45 *Fed.Reg.* 76,618 (1980). The amended regulatory language tracks the statutory language in excluding solid waste from the "extraction, beneficiation and processing of ores and

minerals" from regulation under Subtitle C. *Id.* at 76,620. EPA went further and announced that as a "temporary accommodation of the requests" of the mining industry it would interpret the mining waste exclusion as applying to solid waste from the "exploration, mining, milling, *smelting* and *refining* of ores and minerals." *Id.* at 76,619 (emphasis added). In so doing, EPA acknowledged that such a broad interpretation of the exclusion might not be consistent with Congress's intent in enacting the Bevill Amendment. EPA promised "over the next 90 days" to study the legislative history and consider public comments, suggesting that the exclusion might be narrowed in a subsequent rulemaking action. *Id.* at 76,618. In particular:

> EPA questions whether Congress intended to exclude (1) wastes generated in the smelting, refining and other processing of ores and minerals that are further removed from the mining and beneficiation of such ores and minerals.

*Id.* at 76,619. However, having interpreted the exclusion as extending to smelting operations, EPA "suspended" its listing under Subtitle C of three of the hazardous waste streams from smelting, namely copper blowdown waste, lead impoundment solids, and zinc treatment sludges. *Id.*; 46 *Fed.Reg.* 27,473 (1980). Listing of the other three hazardous smelter wastes was "suspended temporarily" on January 16, 1981, including aluminum potliners which the EPA acknowledged to be clearly hazardous. 46 *Fed.Reg.* 4615 (1981). With respect to aluminum potliners, EPA stated:

> The Agency has no doubt that this waste should be listed as a hazardous waste, since it contains high concentrations of cyanide and has been involved in damage incidents. The lack of comment on the listing reflects further consensus that these wastes are indeed hazardous.

*Id.* However, the EPA excluded the waste "temporarily" from control under Subtitle C of RCRA based on its broad interpretation of the Bevill Amendment. At the same time, EPA again acknowledged that it would reconsider the proper scope of the Bevill exclusion in the future, and "may

amend this exclusion to bring this waste ... back under Subtitle C control." *Id.*

In 1984, Congress enacted the Hazardous and Solid Waste Amendments of 1984, Pub. L.No. 98–616, 98 Stat. 3221. In addition to strengthening the RCRA regulatory regime in a variety of ways, the 1984 Amendments added subsection 3004(x), 42 U.S.C. § 6924(x), which explicitly gives EPA flexibility in fashioning Subtitle C standards for wastes from the extraction, beneficiation and processing of ores and minerals. EPA was given the authority to modify various of the standards for hazardous waste disposal under Subtitle C

> to take into account the special characteristics of such wastes, the practical difficulties associated with implementation of such requirements, and site-specific characteristics, including but not limited to the climate, geology, hydrology and soil chemistry at the site, so long as such modified requirements assure protection of human health and the environment.

42 U.S.C. § 6924(x).

*Concerned Citizens of Adamstown v. EPA*

EPA could not make a determination about whether to regulate mining wastes under Subtitle C until it completed the study required by the Bevill Amendment. The mining waste studies mandated by sections 8002(f) and (p) of RCRA were to be completed by October 21, 1983. EPA missed that statutory deadline, however, and had still not completed the studies when, on September 28, 1984, the EDF and two citizens groups brought suit against the Agency for failure to complete the studies in the time prescribed by law and for failure to make the regulatory determination required by the Bevill Amendment. *Concerned Citizens of Adamstown v. EPA*, No. 84–3041 (D.D.C. Aug. 21, 1985). The plaintiffs in that case also sued EPA for its failure to relist aluminum potliners as a hazardous waste subject to regulation under Subtitle C of RCRA. Plaintiffs challenged EPA's failure, in a timely fashion,

*either* to relist the aluminum potliners after making a determination that they fall outside the scope of the mining waste exclusion *or* to include those wastes in the § 8002(p) study.

In the *Adamstown* case, EPA indicated that it intended to reinterpret the mining waste exclusion to remove certain smelting and refining wastes (including spent potliners) from its scope. Since those wastes would then be subject to Subtitle C regulation, they would not be included in EPA's study of mining wastes. The court awarded summary judgment to the plaintiffs, and ordered EPA to abide by a schedule that the Agency had proposed to the Court. Specifically, the Court ordered EPA to propose its reinterpretation of the mining waste exclusion by September 30, 1985, to complete the studies mandated by §§ 8002(f) and (p) of RCRA by December 31, 1985, and to take final action on the proposed reinterpretation by September 30, 1986.[1]

*EPA's Proposed Reinterpretation of the Bevill Exclusion*

In compliance with the court-ordered timetable established in *Adamstown*, EPA published its proposed reinterpretation of the Bevill mining waste exclusion on October 2, 1985. 50 *Fed.Reg.* 40,292 (1985). EPA proposed to narrow the scope of its previous interpretation as it applied to solid wastes from "processing ores and minerals." The Agency's proposed reinterpretation was based on a careful consideration of the legislative history of the Bevill Amendment. As EPA acknowledged:

> [I]t has become increasingly clear that EPA['s] current interpretation does not best serve the Congress's objective in enacting the Bevill Amendment. Instead it has had the effect of excluding a broad range of wastes, many of which are hazardous, and are often generated many steps beyond the initial extraction and beneficiation of ores and minerals.

**1.** The ruling in *Adamstown* was not appealed, nor has either party sought reconsideration of the matter by the district court.

*Id.* at 40,293. EPA reviewed the legislative history and concluded that it had been "incorrect" in 1980 "in interpreting the mining waste exclusion as encompassing all wastes from primary smelting and refining." *Id.* at 40,294.

EPA concluded that Congress intended the Bevill exclusion to apply to the types of high volume, low hazard wastes deemed "special wastes" in the Agency's 1978 proposed regulations. *Id.* Therefore, EPA proposed to interpret the term "processing" in the mining waste exclusion to apply only to four processing wastes that met the high volume, low hazard standard, namely red and brown muds from bauxite refining, phosphogypsum from phosphoric acid plants, and slag from primary metal smelters and phosphorus reduction facilities. *Id.* at 40,294, 40,301. Of these large-volume processing wastes that would remain excluded from regulation under Subtitle C of RCRA, annual disposal of phosphogypsum from phosphoric acid plants is approximately 47 million metric tons; slag disposal from primary metal smelters is over 4 million metric tons; slag from phosphorous reduction is over 3 million metric tons; and mud from bauxite refining is approximately 2 million metric tons. *Id.* at 40,294. EPA noted that these volumes are comparable to the other wastes deemed "special wastes" in the 1978 proposed regulations, such as the estimated 66 million metric tons of utility waste generated per year and the 12 million metric tons of cement kiln dust. *Id.* at 40,294. The six hazardous smelting wastes, in contrast, are substantially smaller in volume. *Id.* at 40,296, Table 3. These volumes are comparable to or smaller than the quantities of hazardous waste generated by other industries already subject to regulation under Subtitle C. *Id.* at 40,294.

Under EPA's proposed reinterpretation, the Bevill exclusion would no longer apply to the six hazardous smelter wastes previously suspended from regulation following EPA's broad interpretation in 1980 that the Bevill exclusion covered all wastes from primary smelting and refining. The EPA thus proposed to relist those six smelting wastes as hazardous and subject to regula-

tion under Subtitle C of RCRA. *Id.* at 40,295.

EPA solicited public comment on its proposed reinterpretation and invited commenters to identify any other processing wastes, besides the four large-volume processing muds and slags, that met the "special waste" criteria and thus fell within the mining waste exclusion. *Id.* at 40,294–95.

### *EPA's Study of Mining Wastes*

Meanwhile, the EPA completed its § 8002 study of mining wastes and, on December 31, 1985, submitted a Report to Congress on Wastes from the Extraction and Beneficiation of Metallic Ores, Phosphate Rock, Asbestos, Overburden from Uranium Mining and Oil Shale ("Report to Congress"). The report discussed extraction and beneficiation wastes but did not address processing wastes, which were the subject of EPA's proposed reinterpretation of the Bevill Amendment. In its report, EPA found that 1.3 billion metric tons of waste were generated by extraction and beneficiation in 1985, five percent of which (61 million metric tons) exhibit the hazardous characteristics of corrosivity and EP (extraction procedure) toxicity. *Id.* at ES 17. EPA estimated, moreover, that adding wastes with high acid formation potential, wastes containing asbestos and cyanide, and radioactive wastes increases the total of potentially hazardous waste generated by the nonfuel mining industry to 755 million metric tons a year. *Id.* at ES 12–14, 17. The Report goes on to discuss existing waste management practices as well as the economic costs of regulating mining wastes under Subtitle C under various scenarios.

### *EPA's Regulatory Determination*

Following a public comment process, EPA published its "regulatory determination" concerning wastes from the extraction and beneficiation of ores and minerals on July 3, 1986. 51 *Fed.Reg.* 24,496 (1986). The EPA determined that none of the extraction and beneficiation wastes studied should be subject to regulation under Subtitle C of RCRA. While the EPA acknowledged that some of these mining wastes were clearly hazardous, it believed that

"several aspects of EPA's current hazardous waste management standards are likely to be environmentally unnecessary, technically infeasible, or economically impractical when applied to mining waste." *Id.* Although EPA acknowledged that existing law provided it with flexibility to modify hazardous waste standards applied to mining wastes, EPA stated that

> there are substantial questions about whether the flexibility inherent in the statute coupled with the Agency's current data on these wastes provide a sufficient basis for EPA to develop a mining waste program under Subtitle C that addresses the risks presented by mining waste while remaining sensitive to the unique practical demands of mining operations.

*Id.* Instead, EPA indicated its intention to develop a regulatory program for these mining wastes under Subtitle D of RCRA, which governs non-hazardous solid wastes. *Id.* at 24,501. EPA's determination not to regulate these mining wastes under Subtitle C is challenged in the companion case, *Environmental Defense Fund v. EPA*, 852 F.2d 1309.

### EPA's Withdrawal of its Reinterpretation of the Bevill Amendment

On October 9, 1986, a year after EPA published its proposed reinterpretation of the scope of the Bevill Amendment, the Agency announced that it was *withdrawing* its proposed reinterpretation. 51 *Fed. Reg.* 36,233 (1986). The Agency explained that it was withdrawing the reinterpretation because the terms "high volume" and "low hazard" had not been quantified in the proposal, so that the Agency was unable to determine the status of additional wastes nominated by commenters as "special wastes." *Id.* at 36,234. While it did not view the "high volume, low hazard" standard as inherently unsound, EPA pointed to various definitional problems it faced in determining how to group and classify wastes. The Agency concluded that its proposal had to be withdrawn because it failed to set out "practically-applicable criteria for distinguishing processing

from non-processing wastes." *Id.* at 36,-235.

In withdrawing its proposed reinterpretation, the EPA reaffirmed its 1980 interpretation of the Bevill exclusion as "a permissible, though by no means the sole permissible, interpretation" of the statute. *Id.* Moreover, although EPA never contended that the six hazardous smelter wastes were even arguably "high volume, low hazard" wastes, EPA withdrew its proposal to relist those wastes so that they would continue to enjoy the protection of the Bevill exclusion. As EPA explained: "These wastes, under the current interpretation, are deemed to be derived from processing of ores and minerals and so are excluded from regulation under Subtitle C until the requisite section 8002 studies are completed." *Id.* EPA thus failed to meet the requirements of the court order in *Adamstown* with respect to those smelting wastes. They were not included in the § 8002(p) study submitted to Congress on December 31, 1985, a deadline long since passed, because EPA had proposed to exclude them from the scope of the Bevill Amendment and subject them to regulation under Subtitle C. EPA's withdrawal of its proposed reinterpretation, however, left those wastes both unregulated and unstudied as of October 1986. Instead, the EPA indicated that it would continue "to grapple with the problem" of defining the contours of the mining waste exclusion and would proceed with "additional section 8002 studies addressing processing wastes," including the six hazardous smelter wastes. *Id.*

### Combustion Residuals From Industrial Furnaces

On November 29, 1985, shortly after the EPA proposed its reinterpretation of the Bevill Amendment but before that reinterpretation was withdrawn, the Agency issued final regulations in a separate rulemaking proceeding governing the burning of hazardous waste fuel and used oil fuel in utility boilers and industrial furnaces. 50 *Fed.Reg.* 49,164 (1985). In a footnote to the preamble to those regulations, EPA indicated that the Bevill mining waste exclusion "may apply to certain industrial

furnaces burning hazardous waste or used oil." *Id.* at 49,190 n. 89. Any such exclusions would apply "pending development of the boiler and industrial furnace permit standards" regardless of whether or not the furnaces burned hazardous waste or used oil for energy recovery. *Id.*

On May 6, 1987, EPA proposed additional regulations which establish standards for utility boilers and industrial furnaces that burn fuels derived from hazardous wastes. 52 *Fed.Reg.* 16,982 (1987). EPA has solicited comments from the public regarding those proposed burning regulations. Under the May 1987 proposed regulations, the Bevill exclusion would not apply to hazardous wastes burned in smelter furnaces for "material recovery" if "a majority of material feed processed in a device is not an ore or mineral." *Id.* at 17,012. In such cases, "resulting residues are not deemed to be from processing an ore or mineral." *Id.* Nor would the Bevill exclusion apply to combustion residuals from smelting furnaces which burn "secondary materials (rather than ore concentrate)" as the majority of their feedstock. *Id.* at 17,012–13.

EPA's decision to withdraw its proposed reinterpretation and its proposed relisting of the six hazardous smelting wastes is challenged here by the Environmental Defense Fund ("EDF") and the Hazardous Waste Treatment Council ("HWTC"). Petitioners also challenge EPA's exemption of ash from the burning of hazardous waste in smelter furnaces from regulation under Subtitle C of RCRA.

### II. JURISDICTIONAL ISSUES

■■■■ EPA concedes that the Court has jurisdiction to review the Agency's decision in 1986 to withdraw its proposed reinterpretation of the Bevill mining waste exclusion. Under *Montana v. Clark,* 749 F.2d 740, 744 (D.C.Cir.1984), *cert. denied,* 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985), "an agency decision not to amend long-standing rules after a notice and comment period is reviewable agency action." *See also Natural Resources Defense Council ("NRDC") v. EPA,* 824 F.2d 1146, 1150 (D.C.Cir.1987). EPA contends, how-

ever, that petitioners are time-barred from challenging the Agency's original 1980 interpretation of the Bevill exclusion because section 7006(a)(1) of RCRA requires that petitions for review of final agency action be filed within ninety days. 42 U.S.C. § 6976(a)(1). EPA points to *NRDC v. EPA, supra,* as support for its argument that review of its withdrawal of the proposed reinterpretation does not provide an opportunity for a substantive attack on the underlying interpretation established in 1980. Petitioners also invoke *NRDC v. EPA,* replying that their challenge is not time-barred because they seek review of EPA's 1986 decision to withdraw its proposed reinterpretation of the mining waste exclusion, whereby EPA perpetuated by default an interpretation that conflicts with the statute and legislative history.

In *NRDC v. EPA,* this Court rejected a claim that petitioners' challenge to EPA's 1985 decision to withdraw amendments to the vinyl chloride emission standards was actually a "back-door" challenge to regulations promulgated in 1976. 824 F.2d at 1150. The Court found that petitioners were specifically challenging EPA's reliance on cost and technological feasibility in its withdrawal of the proposed amendments in 1985. *Id.* In so characterizing the petitioners' challenge, the Court examined the nature of their argument as well as the type of relief requested. Because the petitioners' challenge focused on the withdrawal of proposed amendments to the vinyl chloride emission standards, as distinguished from the original validity of the regulations, it was not time-barred. *Id.*

We conclude that petitioners' challenge in the case before us is not a "back-door" challenge to EPA's original 1980 interpretation of the Bevill exclusion, but a timely, front-door challenge to EPA's 1986 *withdrawal* of its 1985 proposed reinterpretation. In reviewing petitioners' challenge to EPA's withdrawal of its reinterpretation, which is clearly not time-barred, we must assess the reasonableness of the justification offered and the factors relied upon by EPA in making that decision. *See NRDC v. EPA,* 824 F.2d at 1150. Necessarily, we

cannot avoid consideration of whether the EPA acted in a manner arbitrary and capricious and contrary to law when it made its October 1986 withdrawal decision, which reinstated by default a broad interpretation of the Bevill mining waste exclusion.

To the extent that our review of EPA's 1986 decision necessarily raises the issue of whether the broad 1980 interpretation of the Bevill exclusion is inconsistent with Congressional intent, it is not time-barred. The statutory period for review of that interpretation was effectively renewed by the EPA when it decided in 1986 to withdraw its proposed 1985 reinterpretation in its entirety and thus to reiterate and finalize its 1980 interpretation of the scope of the Bevill mining waste exclusion. This is clear from the factual posture in which this case arises. EPA was equivocal in 1980 when it offered its "temporary" interpretation of the Bevill Amendment as an "accommodation" of the requests of the mining industry. 45 *Fed.Reg.* 76,618 (1980). EPA's tentative 1980 interpretation was not immediately challenged, and EPA promised that:

> [O]ver the next 90 days, [EPA] intends to carefully examine the legislative history of the statutory amendment and consider the public comments being solicited by this action.

*Id.* EPA indicated further that it would likely narrow the scope of the Bevill exclusion in a future rulemaking proceeding. *Id.* The "90 days" stretched into five years, however, and the EPA only offered its proposed reinterpretation in October 1985 in the face of a court-ordered deadline. EPA finally withdrew that reinterpretation in October 1986, thereby transforming its "temporary" 1980 interpretation into a final decision and subjecting that interpretation to judicial review.

Functionally, the EPA's 1980 interpretation is analogous to a preliminary injunc-tion. While a party may appeal a preliminary injunction, a failure to do so does not foreclose an appeal of a final injunction. EPA's decision in 1986 to reaffirm its "tentative" 1980 interpretation finalized that interpretation and renewed the time for obtaining judicial review. *See Geller v. FCC*, 610 F.2d 973, 977–78 (D.C.Cir.1979) (statutory period for review renewed by later events). Hence, we are not time-barred from considering whether the broad interpretation of the Bevill Amendment that EPA decided to reaffirm by default in 1986 is inconsistent with Congressional intent.[2]

### III. THE MERITS

Petitioners contend that EPA's withdrawal of its proposed reinterpretation of the Bevill Amendment was arbitrary and capricious and contrary to law because it was not based on EPA's view of the proper scope of the amendment but rather on EPA's refusal to determine the precise contours of the exclusion. Petitioners stress that in withdrawing its proposed reinterpretation in 1986, the EPA did not disaffirm its 1985 interpretation of Congressional intent: that is, that Congress intended the Bevill exclusion to apply only to "high volume, low hazard" "special wastes." On the contrary, petitioners argue that the Agency's sole justification for withdrawing its reinterpretation was that it had not yet defined the full contours of the proposed "high volume, low hazard" standard. Petitioners argue further that EPA knew, in any event, that the six hazardous smelter wastes were not properly within the scope of the Bevill exclusion, regardless of the status of any additional waste streams.

EPA responds that its withdrawal of the proposed reinterpretation was reasonable and supported by the record. In articulating the "high volume, low hazard" standard, EPA identified four wastes that it

---

**2.** It should also be noted that there is authority in this Circuit that "a petitioner's contention that a regulation should be amended or rescinded because it *conflicts with the statute* from which its authority derives is reviewable outside of a statutory limitations period." *National Labor Relations Board Union v. Federal Labor Re-* *lations Authority,* 834 F.2d 191, 196 (D.C.Cir. 1987). Review in such a situation would follow the framework laid down by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

thought met this standard, and proposed to remove all other "processing" wastes from the Bevill exclusion. When commenters claimed that other wastes fit the "high volume, low hazard" standard, EPA found that it could not assess those claims because the Agency had not quantified or defined the terms "high volume" or "low hazard" in its proposal. EPA was required by the schedule established in *Adamstown* to take final action on its proposed reinterpretation by September 30, 1986. EPA argues that its decision to withdraw its reinterpretation was not arbitrary and capricious because the proposal was imprecise and could not be refined in time to meet the district court's deadline. *See* Respondents' Brief at 13, 16, 21–22. In support of this claim, EPA elaborates various problems with its proposed interpretation, including definitional and data problems. *Id.* at 17–22. EPA contends, moreover, that its reaffirmation of the 1980 interpretation is a permissible construction of the mining waste exclusion. *Id.* at 32–41.

■ For the reasons discussed below, we conclude that EPA's decision to withdraw its proposed reinterpretation in its entirety was arbitrary and capricious and contrary to law because it left unlisted the six hazardous smelter wastes and reaffirmed an impermissibly over-broad interpretation of the Bevill Amendment. EPA did not seek an extension of time from the district court within which to refine its reinterpretation of the Bevill Amendment. Instead, the Agency abandoned its effort to formulate an interpretation of the Bevill Amendment consistent with Congressional intent. The fact that the EPA did not quantify the full contours of the "high volume, low hazard" standard in its 1985 proposal is not a rational justification for withdrawing the proposal to relist the six hazardous smelter wastes, which are not properly included within the scope of the Bevill Amendment. Nor is it a reason for failing to further refine the "high volume, low hazard" standard in a timely manner and either *exclude* additional processing wastes from the scope of the Bevill Amendment *or* complete the studies and make the regulatory determination mandated by statute.

## A. *The Standard of Review*

■ As provided in § 7006(a)(1) of RCRA, 42 U.S.C. § 6976(a)(1), the EPA decisions challenged here are subject to review in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. The APA provides that a reviewing court shall set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While the "scope of review under the 'arbitrary and capricious' standard is narrow," the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). Moreover, if the agency "does not reasonably accommodate the policies of a statute or reaches a decision that is 'not one that Congress would have sanctioned,' ... a reviewing court must intervene to enforce the policy decisions made by Congress." *Natural Resources Defense Council v. Herrington*, 768 F.2d 1355, 1383 (D.C.Cir. 1985) (citations omitted).

Judicial review of EPA's interpretation of the Bevill Amendment is governed by the framework set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We must first consider whether Congress "has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. As the *Chevron* Court declared:

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*Id.* at 842–43, 104 S.Ct. at 2781. If Congress is silent on the issue, however, or its intent is ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the

statute." *Id.* at 843, 104 S.Ct. at 2781. *See also I.N.S. v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

In ascertaining the intent of Congress, the reviewing court should look first to the language and structure of the statute itself. "If the answer is not yielded by the statute, then the court is to look to secondary indicia of intent, such as the measure's legislative history." *American Mining Congress v. EPA,* 824 F.2d 1177, 1182 (D.C. Cir.1987).

### B. *The Bevill Mining Waste Exclusion*

#### 1. *The Statutory Language and Structure of the Mining Waste Exclusion*

The Bevill Amendment suspends solid waste from the "extraction, beneficiation, and processing of ores and minerals" from regulation under Subtitle C of RCRA until EPA has completed certain studies and made a regulatory determination. 42 U.S. C. § 6921(b)(3)(A)(ii). Although the first step in statutory interpretation is usually to discern "the ordinary meaning of the words used," *Securities Industry Ass'n v. Board of Governors,* 468 U.S. 137, 149, 104 S.Ct. 2979, 2986, 82 L.Ed.2d 107 (1984), the words "waste from ... processing of ores and minerals" do not convey a self-evident, accepted meaning. EPA conceded as much when it concluded in 1985 that the term "processing" had no standard definition or plain meaning. 50 *Fed.Reg.* 40,293 (1985).

At the same time, the structure of the Bevill Amendment suggests that Congress intended to single out high-volume "special wastes" for regulatory suspension when it excluded "solid waste from the extraction, beneficiation and processing of ores and minerals, including phosphate rock and overburden from the mining of uranium ore." Solid waste from the *extraction* of ores and minerals consists of very large volumes of overburden and waste rock excavated during mining. Solid waste from the *beneficiation* of ores and minerals includes large volumes of crushed rock tailings. *See* EPA's Report to Congress at ES 4–6. Congress also expressly included "rock and overburden" from the mining of

uranium ore. The structure of the Bevill Amendment suggests that the term "solid waste from the ... processing of ores and minerals" should be interpreted in a manner consistent with the concept of large volume wastes. Such an interpretation is reinforced by the fact that the other wastes singled out for exclusion in the Bevill Amendment are also large volume wastes, namely "[f]ly ash waste, bottom ash waste, slag waste, and flue gas emission control waste generated primarily from the combustion of coal or other fossil fuels" and "[c]ement kiln dust waste." 42 U.S.C. §§ 6921(b)(3)(A)(i), (iii). *See* 43 *Fed.Reg.* 58,992 (1978); 50 *Fed.Reg.* 40,294 (1985) (estimated volumes of these wastes).

The statutory structure thus suggests that Congress intended the exclusion to apply to wastes generated in large volumes. However, because the statutory term "processing" does not on its face admit of a standard definition, and because the precise meaning of that term is not fully apparent from the structure of the statute, we must turn to the legislative history of the Bevill exclusion for more precise guidance on Congressional intent.

#### 2. *The Legislative History of the Bevill Amendment*

The legislative history of the Bevill Amendment establishes that the key to understanding Congress's intent is the concept of "special waste" articulated in the regulations proposed by EPA on December 18, 1978 following the enactment of RCRA. 43 *Fed.Reg.* 58,991–92 (1978); 50 *Fed.Reg.* 40,293–94 (1985). In the preamble to those regulations, EPA explained that it intended to treat certain "special wastes" differently because they were generated in very large volumes, were thought to pose a relatively low hazard, and were not necessarily amenable to the management standards proposed for hazardous waste treatment, storage, and disposal facilities. These "special wastes" included "cement kiln dust, utility waste (fly ash, bottom ash, and scrubber sludge), phosphate mining and processing waste, uranium and other mining waste,

and gas and oil drilling muds and oil production brines." 43 *Fed.Reg.* 58,991 (1978).

The Bevill Amendment was a distinct, self-contained amendment to the RCRA statute. It was proposed on the House floor by Congressman Bevill and was adopted after a detailed explanation of its purpose and scope by Congressman Bevill and other supporters. The Conference Committee Report accompanying the 1980 amendments to RCRA adopted the Bevill Amendment with only a minor modification pertaining to uranium overburden. The Conference Report states clearly that the Bevill Amendment suspends regulation under Subtitle C of utility wastes as well as "all other wastes ... in a category designated as 'special wastes' in regulations proposed by the Agency under Subtitle C on December 18, 1978." H.R.Conf.Rep. No. 1444, 96th Cong., 2d Sess. 32 (1980), U.S. Code Cong. & Admin.News 1980, 5019, 5031–5032.

Congressman Bevill explained the purpose of his amendment on the House floor:

> [I]t would require EPA to defer imposition of regulatory requirements on the disposal of the waste by-product of fossil fuel combustion, of discarded mining materials and of cement kiln dust waste until after EPA has completed studies to determine whether, if at all, these materials present any hazard to human health or the environment.

26 *Cong.Rec.* 3361 (1980). He then referred specifically to EPA's 1978 proposed regulations on "special wastes" to which his amendment was a response:

> EPA has itself recognized that it has "very little information on the composition, characteristics, and degree of hazard posed by these wastes." In its announcement, printed in the Federal Register of December 18, 1978, EPA announced it did not have data on the effectiveness of current or potential waste management technologies or the technical or economic practicability of imposing its proposed regulations. In that same announcement EPA also stated that it believed that any potential hazards

presented by the materials "are relatively low."

*Id.* Congressman Bevill then stated that his amendment "would require EPA to promptly undertake studies to fill these gaps in the agency's knowledge, and to determine whether there is any health or environmental problem from the disposal of these coal by-product wastes and other materials listed [in] the amendment." *Id.*

The discussion of the Bevill Amendment on the House floor indicates that the amendment was viewed as a direct response to EPA's 1978 proposed regulations and was designed to suspend the Agency's regulation of "special wastes" pending further study. Rep. Santini, a supporter of the Bevill Amendment, stated that the amendment would "defer regulation of 'special waste' until after EPA studies the need to do so." *Id.* at 3348. Rep. Staggers, another Bevill Amendment supporter, referred directly to EPA's proposed regulations of December 18, 1978 and stressed that EPA lacked sufficient information to regulate "special wastes." *Id.* at 3349, 3365. Rep. Staggers supported the Bevill Amendment as a suspension of EPA's regulation of "special wastes" under Subtitle C until EPA studied the need for such regulation:

> The amendment provides EPA with sufficient authority to obtain all information necessary to address the possible need for regulation of "special wastes."

*Id.* at 3365. *See also id. at* 3363 (remarks of Rep. Findley).

During discussion of the mining waste exclusion on the House floor, Rep. Williams of Montana stated that: "This amendment would direct the Environmental Protection Agency to evaluate certain high volume, low toxicity wastes so as to assure a reasoned set of regulations by which to manage these wastes." *Id.* at 3364. He also discussed the inert slag wastes generated by the smelting of copper, and he went on to say that such wastes would not be regulated until a thorough study established the need for regulation. *Id.*

In light of these indications of Congressional intent, it is clear that Congress did

not intend the mining waste exclusion to encompass all wastes from primary smelting and refining. On the contrary, Congress intended the term "processing" in the Bevill Amendment to include only those wastes from processing ores or minerals that meet the "special waste" criteria, that is, "high volume, low hazard" wastes.

EPA took note of this legislative history when it proposed its reinterpretation of the Bevill Amendment in 1985. Moreover, the Agency never repudiated its 1985 understanding of Congressional intent when it withdrew its proposed reinterpretation in 1986. Indeed, in 1986, the Agency reiterated that its review of the legislative history of the Bevill exclusion "indicated that the exclusion was intended to cover the category of wastes designated as 'special wastes,' including 'solid waste from the extraction, beneficiation, and processing of ore [and] minerals,' in EPA's 1978 proposed hazardous waste regulations ..." 51 *Fed. Reg.* 36,234 (1986). At the same time, EPA effectively reaffirmed its 1980 interpretation of the Bevill exclusion, which the Agency characterized as "a permissible, though by no means the sole permissible, interpretation." *Id.* at 36,235. Based on our review of the Bevill Amendment's language and structure and legislative history, we cannot agree with this characterization. On the contrary, it is clear that Congress intended the Bevill exclusion to encapsulate the "special waste" concept articulated by the EPA in 1978.[3] Congress's clear intention "is the law and must be given effect." *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9.

### C. *EPA's Decision to Withdraw its Reinterpretation*

Petitioners contend that EPA did not provide a rational justification for withdrawing its proposed reinterpretation of the Bevill exclusion. Petitioners argue that "EPA's

sole justification for withdrawing its reinterpretation was that it was having difficulty determining whether certain additional waste streams were 'high volume/low toxicity' wastes." Petitioners' Brief at 45. They contend that while this might justify further refinement of the proposal, it is not a rational justification for abandoning all efforts to narrow the scope of the Bevill exclusion to conform to Congress's intent. Petitioners argue, moreover, that regardless of the status of any additional waste streams, the six hazardous smelter wastes are not properly within the scope of the Bevill exclusion.

EPA responds that the withdrawal of its proposed reinterpretation was reasonable in light of the numerous practical problems with the proposal and the fact that the Agency was required by court order to make its final determination by September 30, 1986. The Agency contends that it was reasonable for it to withdraw the proposed reinterpretation in full rather than adopt various intermediate options. Respondents' Brief at 22–26. When questioned about the six hazardous smelter wastes at oral argument, counsel for EPA responded that the Agency felt "uncomfortable" taking the partial step of removing the six hazardous wastes from the Bevill exclusion and preferred to address the matter as a whole.

We agree with petitioners' claim that EPA's withdrawal of the proposed relisting of the six hazardous smelting wastes was arbitrary, capricious, and contrary to law. The Agency's withdrawal of its proposal to relist the six hazardous smelter wastes is inconsistent with Congress's intent in enacting the Bevill Amendment. Moreover, the fact that EPA did not quantify all the parameters of the "high volume, low hazard" standard in its 1985 proposal, impeding judgment in borderline cases involving other wastes, is not a rational justification

**3.** Several mining trade associations, as well as the Kennecott corporation, intervene in support of the EPA. In addition to arguing that EPA's withdrawal of the proposed reinterpretation was reasonable, they also argue that Congress intended the Bevill exclusion to apply to all smelting and refining operations. They point to

various aspects of the legislative history of the Bevill Amendment to support their view that wastes from the "processing" of ores and minerals include all smelting and refining wastes. We find their arguments unpersuasive in light of the legislative history analyzed above.

for withdrawing the proposal to relist the six hazardous smelting wastes which clearly would not qualify under any acceptable definition, however precise, of "special wastes." Since EPA found that those six smelter wastes are low volume and high hazard wastes, it cannot refuse to list them. Those six wastes are not properly within the scope of the Bevill exclusion regardless of the status of any additional wastes.

This is not to say that it was unreasonable for the EPA to conclude that it needed more time to refine and clarify its proposed reinterpretation in light of the ambiguities discovered and questions encountered in classifying additional processing wastes in the "grey areas." However, it was arbitrary and capricious for the EPA to withdraw the proposed reinterpretation in its entirety before first determining whether the district court would have granted it an extension of time within which to refine the proposal and work out the unanticipated problems and ambiguities. Moreover, at whatever point EPA took final action on the proposed reinterpretation it was obliged to resolve those ambiguities consistent with Congressional intent. The Agency did not meet its obligations because it chose to withdraw its proposed reinterpretation in full, including the proposed relisting of the six hazardous smelter wastes, and to reinstate by default an impermissibly overbroad interpretation of the Bevill Amendment.

We also note that by reaffirming its 1980 interpretation which included all wastes from primary smelting and refining within the scope of the Bevill Amendment, the EPA placed itself in violation of the court order in *Adamstown.* EPA promised to either study those wastes or exclude them from the scope of the Bevill Amendment. It did neither. Specifically, under the *Adamstown* order, EPA was to propose its reinterpretation of the Bevill Amendment by September 30, 1985 (which the EPA did), and to submit a study of the Bevill mining wastes to Congress by December 31, 1985 (which the EPA did). However, that study covered only extraction and beneficiation wastes. No processing wastes were studied because the 1985 reinterpretation proposed to remove most of those wastes (including the six hazardous smelter wastes) from the scope of the Bevill Amendment. However, by withdrawing that reinterpretation in its entirety in 1986, EPA allowed processing wastes to fall through the cracks—they were neither studied by EPA nor excluded from the Bevill Amendment's scope.

### D. *Combustion Residuals From Industrial Furnaces*

■ Petitioners challenge EPA's exemption of ash from the burning of hazardous waste in smelter furnaces from Subtitle C regulation. Focusing on a footnote in EPA's burning regulations of November 29, 1985, and citing the Agency's proposed regulations of May 6, 1987, petitioners contend that ash from the burning of hazardous wastes in smelter furnaces is not properly within the scope of the Bevill Amendment and should thus be regulated under Subtitle C of RCRA. Petitioners' Brief at 17–19, 22, 25, 37–39, 42–43. Invoking the doctrine of primary jurisdiction, EPA responds that this issue should not be reviewed by the Court at this time because it is the subject of an ongoing rulemaking procedure, i.e., the May 6, 1987 proposed burning regulations. Alternatively, EPA argues that this issue is subject to judicial review in another case pending before this Court, *Hazardous Waste Treatment Council v. U.S. Environmental Protection Agency,* No. 86–1143. Respondents' Brief at 43–49.

We agree with respondents that petitioners' challenge to the exemption of ash from burning hazardous wastes in smelter furnaces is not appropriate for review in the instant case. First, the status of ash residues from burning hazardous wastes in industrial furnaces is not directly addressed in the 1985 proposed reinterpretation of the Bevill Amendment or the 1986 withdrawal under review in this case. Second, the November 29, 1985 regulations governing the burning of hazardous wastes and used oil in utility boilers and industrial furnaces, including the footnote challenged

by petitioners here, are under review in another case pending before this Court, No. 86–1143, brought by Hazardous Waste Treatment Council, one of the petitioners in this case. The challenge to footnote 89 raised in this case is more appropriately addressed in that direct challenge to the November 1985 regulations. Finally, EPA has explicitly addressed the issue of combustion residuals from industrial furnaces in its May 6, 1987 proposed burning regulations. That rulemaking is still ongoing so the issue is not appropriate for review here.

## IV. Relief to be Granted

Petitioners seek an order directing the EPA to proceed with its proposed relisting of the six hazardous smelting wastes. Petitioners are entitled to the relief they seek. Since the six hazardous smelter wastes clearly are not "high volume, low hazard" wastes, EPA cannot refuse to relist them. They are not properly within the scope of the Bevill exclusion regardless of the status of any additional processing wastes. Accordingly, EPA shall relist the six hazardous smelter wastes by *August 31, 1988.*

Petitioners also ask the Court to impose a schedule on EPA for determining which large volume processing wastes remain within the Bevill exclusion and for completing its regulatory responsibilities with respect to those wastes. EPA is obligated to study the processing wastes that remain excluded from regulation under Subtitle C but were not included in the § 8002 studies or the report submitted to Congress on December 31, 1985. Furthermore, EPA is obligated by statute, within six months after it submits a report to Congress on those remaining processing wastes, to decide to regulate them under Subtitle C or determine that such regulation is unwarranted. 42 U.S.C. § 6921(b)(3)(C).

EPA argues that the relief requested by petitioners is unnecessary because the Agency is now conducting the required § 8002 studies on various processing wastes and "may well conclude that Subtitle C regulation is appropriate for these wastes." Respondents' Brief at 43.

EPA's history of delay and missed deadlines with respect to its statutory obligations to complete the § 8002 mining waste studies, however, indicates that a court-imposed schedule is necessary here. *See Public Citizen Health Research Group v. Brock,* 823 F.2d 626 (D.C.Cir. 1987); *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70 (D.C. Cir.1984). EPA violated the October 21, 1983 statutory deadline for completing the § 8002 studies. 42 U.S.C. §§ 6982(f), (p). EPA violated the court order in *Adamstown* by failing to either include processing wastes in the § 8002 study submitted to Congress on December 31, 1985, or to exclude them from the scope of the Bevill Amendment and subject them to regulation under Subtitle C. The *Adamstown* order was based on EPA's own proposed schedule; yet the Agency failed to fully comply with its requirements.

Accordingly, EPA shall adhere to the following schedule for fulfilling its statutory obligations with respect to processing wastes under the Bevill Amendment. EPA shall propose by October 15, 1988 which processing wastes remain within the Bevill exclusion as "high volume, low hazard" special wastes. EPA shall, after notice and comment, make a final determination of which processing wastes remain within the Bevill exclusion as "high volume, low hazard" special wastes by February 15, 1989. EPA shall complete the § 8002 studies of any processing wastes remaining within the Bevill exclusion and submit those studies to Congress by July 31, 1989. As required by statute, EPA shall make its regulatory determination with respect to those wastes within six months of the submission of the report to Congress.

So ordered. This Court will retain jurisdiction to ensure compliance with this Order.