STATE OF TEXAS, Plaintiff–Appellant,

Texas Citrus Mutual,
Intervenor–Appellant,

v.

Richard E. LYNG, Secretary, United
States Department of Agriculture,
Defendant–Appellee.

No. 88–2483.

United States Court of Appeals,
Fifth Circuit.

March 30, 1989.

Renea Hicks, Sp. Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for State of Tex.

Charles W. Hury, McAllen, Tex., for Texas Citrus Mut.

Joan E. Hartman, John F. Cordes, Elizabeth A. Pugh, Robert S. Greenspan, Attys, Dept. of Justice, Civ. Div., Washington, D.C., for defendant-appellee.

Before GEE, HIGGINBOTHAM, and DUHE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Appellants challenge final rules promulgated by the United States Department of Agriculture, relaxing a quarantine on the shipment of citrus fruit from Florida to other citrus-producing areas.[1] The quarantine was originally instituted to prevent the spread of citrus canker, a plant disease found in Florida citrus groves and nurseries. Appellants complain of a single "technicality" which, in their view, taints USDA's rule making proceeding. The district court found the procedure followed by USDA adequate to satisfy the requirements of the Administrative Procedure Act. We affirm.

I

USDA published proposed regulations on September 17, 1987, designed to permit shipments of citrus fruit from Florida to other citrus-producing areas provided certain conditions were met.[2] The agency accepted comments on its proposal until November 2, 1987, and held public hearings in Florida, Texas and California. Appellants, the State of Texas and Texas Citrus Mutual, submitted written comments at the public hearing in Texas, and a representative of Texas Citrus Mutual testified. Before the close of the comment period, three new outbreaks of nursery strain citrus canker were discovered in Florida. Nursery strains of citrus canker are pathogenically and genetically distinct from the more aggressive Asiatic strains. They appear to present a minimal threat to commercial citrus groves, having been found almost exclusively in nursery environments. Several interested parties, including Texas Citrus Mutual, submitted comments regarding the significance of the new outbreaks for the USDA proposal. After the comment period, five additional nursery strain outbreaks were discovered.

On January 5, 1988, USDA published a withdrawal of its proposal.[3] The withdrawal notice indicated that USDA was acting in response to comments regarding the significance of the new finds of citrus canker. The notice also stated that the agency was "studying alternative protocols," and expected "to publish a new proposal in the near future."

A Special Task Force on Citrus Canker held hearings on January 12 and 13, 1988, reviewing current scientific research with an eye toward developing recommendations for the control and elimination of the plant disease. USDA representatives participated, but appellants were not invited to attend. Several bacteriologists and pathologists testified that the previously published USDA proposal could be administered safely. The Special Task Force recommended implementation of USDA's proposed rules.

On February 11, 1988, the agency published its original proposal as final rules.[4] Appellants concede that the regulations do not differ significantly from their initial form, reflecting only minor changes made in response to comments received by USDA. The agency indicated that it had reconsidered its withdrawal after reviewing all available information and discussing the matter with its experts. USDA concluded that the proposal presented a negligible risk of causing the spread of citrus canker, noting that this conclusion paralleled the Special Task Force's position.

The State of Texas filed this action in the United States District Court for the Southern District of Texas, challenging USDA's rule making procedure. Texas Citrus Mutual intervened. Appellants contended below that after withdrawing its original proposal, USDA could not adopt final regulations without allowing time for additional public comments. In a hearing before the district court, however, appellants failed to

---

1. The quarantine regulations were codified at 7 C.F.R. § 301.75—.75-16 (1988).

2. 52 Fed.Reg. 35105 (Sept. 17, 1987).

3. 53 Fed.Reg. 140 (Jan. 5, 1988).

4. 53 Fed.Reg. 3999 (Feb. 11, 1988).

identify any information they could provide to USDA in a new comment period that USDA did not already possess at the time the final rules were adopted. The district court denied all relief and this appeal ensued.

## II

■ Appellants do not challenge the adequacy of the notice and opportunity for comment offered by USDA after .publishing the original proposal. Presumably, if USDA had merely adopted these final regulations without the intervening withdrawal, appellants would have little to complain of here. Nevertheless, appellants contend that the published withdrawal of the proposal terminated the initial rule making proceeding, technically requiring USDA to start from scratch before promulgating final rules.

Central to appellants' argument is a case from the District of Columbia Circuit, *Action on Smoking and Health v. Civil Aeronautics Board.*[5] In that case, the CAB published a final rule revoking certain smoking regulations. The D.C. Circuit vacated a portion of the rule on the ground that the CAB had provided an inadequate statement of the basis and purpose for its adoption.[6] Later, the CAB published a similar final rule accomplishing the same result, but this time with a more acceptable statement of basis and purpose. The D.C. Circuit again found that the rule making proceeding violated the APA. The court reasoned that if the CAB was merely trying to supply a statement of basis and purpose to rescue the initial rule, the agency was engaging in invalid *post hoc* rationalization. On the other hand, if the agency intended this as a new rule, it had failed to provide the notice and opportunity for public comment required by the APA.

Appellants draw from *Action on Smoking and Health* the proposition that the termination of a rule making proceeding prevents the agency from relying on that proceeding in adopting final rules. Of course, *Action on Smoking and Health* involved a court order vacating part of the original CAB rule. No such court action took place in this case. Appellants argue nevertheless that withdrawal of these proposed rules effectively terminated the rule making in an analogous fashion. They rely on D.C. Circuit cases holding that withdrawal of a proposed amendment to a longstanding rule, after notice and comment, is reviewable agency action.[7] In their view, the ability of a court to review the agency's withdrawal indicates the finality of the rule making proceeding for purposes of the APA.

We disagree with the principle advanced by appellants. Although there may be circumstances which would prevent an agency from relying on a previous notice and comment period, the simple withdrawal of proposed regulations, without more, requires no such result. The rule advocated by appellants would preclude an agency from ever reconsidering its withdrawal of a published proposal. Indeed, appellants' position would lead to the anomalous result that an agency's withdrawal of proposed regulations would be reviewable in court, at least under the D.C. Circuit case law, but the agency could not settle the lawsuit by adopting the withdrawn proposal. Thus, we hold that failure to offer a new comment period after withdrawing this proposal does not, by itself, require invalidation of USDA's final regulations.

## III

We find the case of *Trans–Pacific Freight v. Federal Maritime Commission,*[8] also from the D.C. Circuit, more

**5.** 713 F.2d 795 (D.C.Cir.1983).

**6.** 699 F.2d 1209 (D.C.Cir.1983).

**7.** *Environmental Defense Fund v. Environmental Protection Agency,* 852 F.2d 1316, 1324 (D.C.Cir. 1988); *Natural Resources Defense Council v. United States Environmental Protection Agency,* 824 F.2d 1146, 1150 (D.C.Cir.1987) (en banc);

*Montana v. Clark,* 749 F.2d 740, 744 (D.C.Cir. 1984), *cert. denied,* 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985).

**8.** 650 F.2d 1235, 1257–59 (D.C.Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2315, 68 L.Ed.2d 840 (1981); *see also California v. Simon,* 504

analogous to the present situation. Congress granted an antitrust exemption for concerted rate activities by shippers involved in ocean shipping conferences. The conferences were required to ensure members' compliance with the obligations contained in the conference rate agreements. Congress granted the Federal Maritime Commission power to disapprove conference agreements upon a finding of inadequate self-policing. The Commission issued notice of a proposed rule making to revise regulations relating to these conference agreements, including certain changes in the self-policing regulations. Deciding the self-policing issues warranted separate consideration, the Commission then issued a new notice of proposed rule making on that issue alone. Both proposed sets of rules contained provisions which would require the shipping conferences to give the Commission access to all records of self-policing activities. After a comment period, the Commission promulgated "Final Rules" which did not contain an access-to-records provision. However, in response to petitions for reconsideration, the Commission amended its "Final Rules," adding a provision that would prohibit conference agreements from denying the Commission access to self-policing records.

Various conferences challenged the access-to-records regulation. They argued that once the Commission published final rules without any access-to-records component, the Commission could not adopt an access-to-records regulation without providing a new opportunity for public comment. The D.C. Circuit rejected the argument. Taking what it labelled a "commonsense approach," the court noted that those challenging the regulation had submitted their views during the original comment period. Thus, the court believed the purpose of the APA's notice and comment provisions had been satisfied.

In our case, as in *Trans–Pacific Freight*, appellants participated in the original notice and comment period. Texas Citrus

Mutual even submitted additional comments near the end of the comment period, addressing the significance of the new outbreaks of citrus canker. Thus, under a "commonsense approach," the APA's purpose of allowing comment by interested parties has arguably been fulfilled.

In some ways, the *Trans–Pacific Freight* analysis resembles the harmless error doctrine. In determining whether an agency had to offer a second notice and comment period, the court looked to whether the policies behind the APA notice and comment provisions had been fulfilled in the particular rule making proceeding at issue. By extension, then, if appellants could demonstrate some prejudice, undermining the APA's purposes, as a result of the agency's procedure, then a second comment period might be required. Of course, this analysis differs from the harmless error doctrine, since the very question to be resolved is whether the agency did commit an error by failing to allow further public comments. If no harm has been done, then no error has been committed.

Appellants argue that a harmless error analysis should not be employed in determining compliance with the APA's notice and comment provisions, preferring a rule that such harm would be presumed. Significantly, the APA instructs reviewing courts that "due account shall be taken of the rule of prejudicial error." [9] Appellants believe that in these circumstances, however, "due account" means "no account." They rely on *United States Steel Corp. v. United States Environmental Protection Agency*,[10] which refused to apply the harmless error rule to regulations adopted without any pre-promulgation notice and comment, even though the agency accepted comments after the fact. The court held that the harmless error rule "is to be used only 'when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of

---

F.2d 430 (Temp.Emer.Ct.App.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974).

**9.** 5 U.S.C. § 706.

**10.** 595 F.2d 207 (5th Cir.1979).

decision reached.' " [11] The court further noted, "Absence of such prejudice must be clear for harmless error to be applicable." [12]

Appellants contend that since USDA's "mistake" in this case had a "bearing on the procedure used," *United States Steel Corp.* prevents application of a harmless error analysis. We emphasize that we are not determining whether an agency error is harmless. Rather, we are focusing on the prior question of whether the agency committed an "error" at all. That question had already been resolved in *United States Steel Corp.*, where the agency omitted a procedural step clearly required by the APA. Thus, we are engaged in a different stage of the inquiry than we were in that case. However, even assuming *United States Steel Corp.* governs this appeal, it does not preclude inquiry into whether appellants were prejudiced by the agency's procedure. We held there that failure to allow any public comment until after the agency made its decision could not be harmless because the "error plainly affected the procedure used." [13] This does not mean that any error affecting procedure cannot be harmless. Indeed, any error in application of the APA will almost by definition affect the agency's procedure. Rather, the case merely precludes a finding of harmless error where the agency fails to allow any public comment before reaching a decision, thus circumventing the entire purpose of the APA notice and comment provisions.

We turn, then, to the specific prejudice alleged by appellants in the procedure followed by USDA. First, they claim that USDA's decision not to allow a second period of public comment prevented them from addressing the findings of the Special Task Force. We note that this allegation of prejudice does not flow from USDA's withdrawal of its proposal. Appellants would have been precluded from commenting on

the Special Task Force report in any case, since public comment ended prior to the task force hearings. Those challenging agency rule making can allege such prejudice whenever the agency relies on information unavailable before the close of public comment.

■ The public need not have an opportunity to comment on every bit of information influencing an agency's decision. In *Air Transport Association v. Civil Aeronautics Board*,[14] the CAB adopted a revised filing fee schedule after notice and comment. Some of the fees finally set by the agency were calculated based on internal staff studies estimating time spent by agency officials in processing certain documents. The studies were not made available for public review and comment until the end of the rule making. The D.C. Circuit found no harm in relying on previously unpublished studies:

> Significantly, petitioner does not claim that the time estimates are erroneous or that the final fees are excessive. Petitioner also does not explain what it would have said had it been given earlier access to the staff studies. Under such circumstances, any error generally would be found harmless. *See* 5 U.S.C. § 706 (1982).... [15]

The *Air Transport* decision relied on *Small Refiner Lead Phase–Down Task Force v. United States Environmental Protection Agency*, in which the court stated, "It is ... incumbent upon a petitioner objecting to the agency's late submission of documents to indicate with 'reasonable specificity' what portions of the documents it objects to and how it might have responded if given the opportunity." [16]

■ In our case, appellants complain that they had no opportunity to challenge the Special Task Force report which influenced USDA's final decision. We note that

11. *Id.* at 215 (quoting *Braniff Airways v. Civil Aeronautics Board,* 379 F.2d 453, 466 (D.C.Cir. 1967)).

12. *Id.*

13. *Id.*

14. 732 F.2d 219 (D.C.Cir.1984).

15. *Id.* at 224 n. 11.

16. 705 F.2d 506, 540–41 (D.C.Cir.1983).

the report was apparently not a "study," in the sense that it involved the collection of previously unreported data. Rather, the task force heard testimony regarding the current state of scientific research on citrus canker. Thus, the evidence gathered by the task force, and the report of the task force itself, were similar to comments USDA would receive during the public comment period. Appellants presumably had access to most of the information relied on by witnesses before the task force, and could have commented on it during the initial comment period. Further, appellants do not explain what they would have said in response to the Special Task Force report. Under the reasoning of *Air Transport*, then, failure to allow public comment after the issuance of the task force report was harmless.

Appellants also argue that they received no opportunity to comment on the significance of the five outbreaks of nursery strain citrus canker occurring after close of the comment period. We note that three such outbreaks occurred prior to the close of the comment period, and Texas Citrus Mutual submitted its views on their importance. It is undisputed that USDA knew about all eight citrus canker finds. Further, appellants' ability to comment on these matters was not affected by the fact that USDA published a withdrawal of its proposal before adopting final regulations. Again, appellants do not identify any new information they would have submitted to the agency if given the opportunity. Thus, we again conclude that failure to allow a new comment period did not prejudice appellants.

■ Finally, appellants contend that publication of the withdrawal convinced appellants that they had won the political battle over the citrus canker regulations. They therefore failed to use more "informal" methods of influencing USDA's decision, such as lobbying the agency through the Texas congressional delegation. While such lobbying undoubtedly occurs, we do not believe the APA was designed to protect these informal methods of influencing agency decisions. Thus, this allegation does not constitute the type of prejudice relevant to deciding whether APA requires a second comment period.

## IV

We conclude that USDA had no obligation to provide a second period of public comment before promulgating final citrus canker regulations. USDA's published withdrawal of its proposal did not automatically require a new comment period, and appellants have not demonstrated the sort of prejudice from USDA's procedure which would indicate that the purposes of the APA's notice and comment provisions had been undermined. The district court opinion is therefore

AFFIRMED.