IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 00-30117

---

SIERRA CLUB,

                                        Plaintiff-Appellant,

versus

U.S. FISH AND WILDLIFE SERVICE; NATIONAL MARINE
FISHERIES SERVICE,

                                        Defendants-Appellees.

---

Appeal from the United States District Court
For the Eastern District of Louisiana

---

March 15, 2001

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case requires us to assess the validity of agency action under the Endangered Species Act (ESA).[1] Appellant challenges the refusal of the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) to designate "critical habitat" for the Gulf sturgeon. Appellant contends that this decision relied on an invalid regulation and is therefore arbitrary and capricious. We agree and now reverse.

I

---

[1] 16 U.S.C.A. § 1531 *et seq.* (2000).

The Gulf sturgeon is a large, wide-ranging fish that can reach up to fifty years of age and five-hundred pounds in size. The sturgeon is one of the few anadromous species in the Gulf of Mexico, migrating between fresh and salt water. The sturgeon spends spring and summer in the Gulf Coast rivers from Louisiana to Florida.[2] In the winter months, the sturgeon returns to the waters of the Gulf of Mexico to feed. Although the sturgeon once supported a major commercial fishery, habitat destruction and overfishing conspired to bring about a population collapse.[3] This alarming decrease in population led to the sturgeon's listing as a threatened species in 1991.[4]

The listing of the sturgeon as a threatened species triggered the "critical habitat" provisions of the ESA. The ESA requires the Secretary of the Interior to "designate any habitat of such species which is then considered to be critical habitat" concurrently with the listing of the threatened species, unless a statutory exception applies.[5] Although the Secretary invoked two one-year statutory

---

[2] *See* Decision on Designation of Critical Habitat for the Gulf sturgeon, 63 Fed. Reg. 9967, 9969 (Feb. 27, 1998).

[3] *See id.* at 9967, 9971.

[4] *See* Threatened Status for the Gulf sturgeon, 56 Fed. Reg. 49653 (Sept. 30, 1991); *see also* 16 U.S.C.A. § 1533(c) (articulating the listing mechanism for the Endangered Species Act). A "threatened species" is defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C.A. § 1532(20).

[5] 16 U.S.C.A. § 1533(a)(3)(A).

extensions from the listing date,[6] no critical habitat was designated for the sturgeon by the deadline.[7]

In 1994, the Orleans Audubon Society filed suit in the United States District Court for the Eastern District of Louisiana, seeking to compel the Department of the Interior to decide whether to designate critical habitat for the sturgeon. While the litigation was pending, the Department assured the Orleans Audubon Society and the district court that it was in the process of designating critical habitat for the sturgeon. The FWS prepared a draft proposal to this effect, which stated that critical habitat designation would provide additional benefit to the sturgeon. The court ordered the Department on August 9, 1995, to "take all appropriate action," prompting the Department to render a decision.

On August 23, 1995, the FWS and the NMFS[8] signaled an abrupt change of course. The Services decided not to designate critical habitat for the sturgeon, finding that it was "not prudent" to do

---

[6] *See* 16 U.S.C.A. §§ 1533(b)(6)(A), 1533(b)(6)(C)(ii).

[7] At the time of the sturgeon's listing, the Secretary refrained from designating critical habitat, finding that "designation of critical habitat may be prudent for the Gulf sturgeon but is not now determinable." 56 Fed. Reg. at 49656. The Secretary set May 2, 1995, as the deadline for a final decision. *See id.*

[8] The ESA divides responsibility for endangered or threatened species between the Department of Interior and the Department of Commerce. 16 U.S.C.A. § 1533(a)(2). The Secretaries of these agencies delegated their authority concerning fresh water and marine endangered species to the FWS and NMFS. *See* 50 C.F.R. § 402.01(b) (2000). The FWS and NMFS jointly made the decision not to designate critical habitat in this case.

so.[9] The Services concluded that designation would not provide additional benefit to the species beyond other statutory regimes and conservation programs in place.[10] In the wake of this decision, the Gulf States Marine Fisheries Commission approved a comprehensive Recovery/Management Plan for the Gulf sturgeon.[11]

The Orleans Audubon Society amended its complaint to challenge the Services' refusal to designate critical habitat. The district court found that the Services had failed to articulate a rational basis for their finding that designation was "not prudent."[12] Although the Services' decision described various programs that would ostensibly provide benefit to the sturgeon in lieu of designation, the court found no evidence in the record to support this assertion. It therefore remanded to the Services for action in accordance with the best scientific evidence available.

On February 27, 1998, the Services decided on remand that critical habitat designation remained "not prudent."[13] The Services found that designation would not provide any additional benefit to

---

[9] *See* Decision on Designation of Critical Habitat for the Gulf Sturgeon, 60 Fed. Reg. 43,721 (Aug. 23, 1995).

[10] *See* 60 Fed. Reg. at 43,722-23.

[11] The ESA contemplates the development of recovery plans to promote "the conservation and survival" of endangered and threatened species. 16 U.S.C.A. § 1533(f)(1).

[12] *See Orleans Audubon Soc'y v. Babbitt*, No. 94-3510 S (E.D. La. Oct. 28, 1997) (unpublished).

[13] *See* Decision on Designation of Critical Habitat for the Gulf sturgeon, 63 Fed. Reg. 9967 (Feb. 27, 1998).

4

the sturgeon.[14] The Sierra Club challenged this decision in the U.S. District Court for the Eastern District of Louisiana. Although the district court conceded that the regulation on which the Services based much of their reasoning, 50 C.F.R. § 402.02, appeared to conflict with the language of the ESA, the district court granted summary judgment in favor of the Services. The court found that the Services's conclusions were "minimally rational" and supported by the best scientific evidence available. Sierra Club appeals the court's ruling.

## II

In 1973, Congress enacted the ESA as a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such endangered species and threatened species."[15] The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided [by the ESA] are no longer necessary."[16] As the district court observed, the objective of the ESA is to enable listed species not merely to

---

[14] *See id.* at 9973.

[15] 16 U.S.C.A. § 1531(b).

[16] 16 U.S.C.A. § 1532(3).

survive, but to recover from their endangered or threatened status.[17]

To achieve this objective, Congress required the Secretary of the Interior to designate a "critical habitat" for all listed species.[18] The ESA defines occupied critical habitat as "the specific areas within the geographic area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection."[19] In addition to "occupied habitat," the ESA contemplates the designation of "unoccupied critical habitat." Unoccupied habitat is composed of the "specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species."[20]

Once a species has been listed as endangered or threatened, the ESA states that the Secretary "shall" designate a critical

---

[17] *See* 50 C.F.R. § 402.02 (2000) ("'Recovery' means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in" the ESA) (emphasis omitted); 63 Fed. Reg. at 9968 ("[T]he Act defines 'conservation' to mean recovery of the species").

[18] *See* 16 U.S.C.A. § 1533(a)(3); *Bennett v. Spear*, 520 U.S. 154, 157-58 (1997).

[19] 16 U.S.C.A. § 1532(5)(A)(i).

[20] 16 U.S.C.A. § 1532(5)(A)(ii).

habitat "to the maximum extent prudent or determinable."[21] The ESA leaves to the Secretary the task of defining "prudent" and "determinable."[22] According to Interior Department regulations, critical habitat designation is "not prudent" where either of two conditions is met: "(i) [t]he species is threatened by taking or other human activity, and identification of critical habitat can be expected to increase the degree of such threat to the species, or (ii) [s]uch designation of critical habitat would not be beneficial to the species."[23] Although the ESA does not define the scope of the "not prudent" exception, the statute requires the Secretary to make the designation decision "on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat."[24]

Critical habitat designation primarily benefits listed species through the ESA's consultation mechanism. Section 7(a)(2) of the

---

[21] 16 U.S.C.A. § 1533(a)(3).

[22] *See* 16 U.S.C.A. § 1533(h); *TVA v. Hill*, 437 U.S. 153, 172 (1978).

[23] 50 C.F.R. § 424.12(a)(1) (2000). The circumstances under which designation is not "determinable" are not relevant to this case. However, agency regulations indicate that designation is not determinable when "(i) [i]nformation sufficient to perform required analyses of the impacts of the designation is lacking, or (ii) [t]he biological needs of the species are not sufficiently well known to permit identification of an area as critical habitat." 50 C.F.R. § 424.12(a)(2) (2000).

[24] 16 U.S.C.A. § 1533(b)(2); *Bennett v. Spear*, 520 U.S. 154, 172 (1997).

statute requires federal agencies to consult with the Secretary to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of that species's critical habitat.[25] Thus, regardless of whether critical habitat is designated, an agency must consult with the Secretary where an action will "jeopardize the continued existence" of a species. If critical habitat has been designated, the statute imposes an additional consultation requirement where an action will result in the "destruction or adverse modification" of critical habitat.

Although the ESA does not elaborate on the two consultation scenarios discussed above, 50 C.F.R. § 402.02 defines each in terms of the effects of agency action on both the survival and recovery of the species. Thus, to "jeopardize the continued existence of" a species is "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of *both the survival and recovery* of a listed species in the wild."[26] This "jeopardy standard" is similar to the regulation's description of "destruction or adverse modification" of critical habitat. The regulation defines "destruction or adverse modification" as "a direct or indirect alteration that appreciably

---

[25] 16 U.S.C.A. § 1536(a)(2).

[26] 50 C.F.R. § 402.02 (emphasis added).

8

diminishes the value of critical habitat for *both the survival and recovery* of a listed species."[27]

### III

The 1998 critical habitat decision by the Services relied on the "not prudent" exception to the ESA. The Services noted, first, that "[c]ritical habitat, by definition, applies only to Federal agency actions."[28] They observed that agencies would have to engage in "jeopardy consultation" under the ESA where agency action could jeopardize the existence of a listed species.[29] The Services reasoned that virtually any federal action that would adversely modify or destroy the Gulf sturgeon's critical habitat would also jeopardize the species' existence and trigger jeopardy consultation. Relying on the definitions of the destruction/adverse modification and jeopardy standards in 50 C.F.R. § 402.02, the Services concluded that designation of critical habitat would provide no additional benefit to the sturgeon beyond the protections currently available through jeopardy consultation.[30]

---

[27] *Id.* (emphasis added).

[28] Decision on Designation of Critical Habitat for the Gulf sturgeon, 63 Fed. Reg. 9967, 9969 (Feb. 27, 1998).

[29] *See id.* at 9969; 16 U.S.C.A. § 1536(a)(2).

[30] *See* 63 Fed. Reg. at 9969.

9

The Services also considered the merits of critical habitat designation in light of federal and state statutory prohibitions against taking members of the species; the water quality standards set by Gulf Coast states; the federal Clean Water Act; and the priority tasks of the Recovery/Management Plan established for the sturgeon.[31] The Services concluded that, where the protections afforded by these measures proved insufficient to safeguard the survival of the sturgeon, jeopardy consultation would be sufficient.[32]

The Services further noted that it was rare for agency action to adversely modify or destroy critical habitat without also jeopardizing the existence of the species. The Services concluded that these rare instances might involve federal action in the unoccupied critical habitat of an endangered species.[33] Because critical habitat designation would protect the survival and recovery of the endangered species in a manner not afforded by jeopardy consultation, designation would be beneficial in those instances. Since the sturgeon is merely a *threatened* species, however, the Services reasoned that expansion of its population into unoccupied critical habitat would not be necessary for both

---

[31] *See id.* at 9972-73.

[32] *See id.*

[33] *See* id. at 9969.

survival and recovery.[34] Later in the decision, the Services stated:

"Protection of unoccupied habitat is . . . essential for full

recovery, but not for survival of the Gulf sturgeon."[35] Designation

of unoccupied habitat was therefore deemed not prudent.[36]


IV

A

Sierra Club contends that the regulation which informs much of

the Services' 1998 decision facially conflicts with the ESA.[37] We

---

[34] *See* Decision on Designation of Critical Habitat for the Gulf
sturgeon, 63 Fed. Reg. 9967, 9969 (Feb. 27, 1998).

[35] *Id.* at 9973.

[36] *See id.* at 9973.

[37] The district court found that Sierra Club brought a facial
challenge to 50 C.F.R. § 402.02. The court noted that the Services
not only failed to object to this approach, but also made
responsive arguments to the merits of the facial challenge. The
court treated the issue as having been tried by the consent of the
parties. *See* Fed. R. Civ. P. 15(b) (2000). On appeal, both parties
have presented argument on the validity of the regulation. Although
the administrative record for the regulation is not before this
Court, that is of no moment. Our review is limited to interpreting
the extent to which the regulation is consistent with the statute—a
task which we are competent to perform without the administrative
record. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 (1987) ("The
judiciary is the final authority on issues of statutory
construction.") (quoting *Chevron, U.S.A., Inc. v. Natural Resources
Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)).
  Sierra Club contends merely that the regulation conflicts with
the statute. It does not address the reasonableness of the
decision-making process engaged in by the Services in framing the
regulation. Consequently, we need not review the regulation under
the Administrative Procedure Act (APA). *See Texas Office of Pub.
Util. Counsel v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999) (noting
that "arbitrary and capricious review" under the APA differs from

11

review a regulation interpreting the ESA under *Chevron, U.S.A.,
Inc. v. Natural Resources Defense Council, Inc.*[38] The first step of
the *Chevron* inquiry requires us to determine whether Congress has
"directly spoken to the precise question at issue."[39] Reversal is
warranted only where an agency interpretation is contrary to "clear
congressional intent."[40] Step two of *Chevron* applies when the
statute is either silent or ambiguous. Under these circumstances,
the court determines whether the agency interpretation is a
"permissible construction of the statute."[41] We reverse only if the
agency's construction is "arbitrary, capricious or manifestly
contrary to the statute."[42] Deference is warranted where the
agency's construction is permissible.[43]

With the appropriate standard of review in mind, we turn to
the merits of Sierra Club's challenge to 50 C.F.R. § 402.02. Sierra
Club observes that the regulation defines the jeopardy and

---

*Chevron* review in that the former focuses on the reasonableness of
the agency's decision-making process rather than the reasonableness
of its interpretation).

[38] 467 U.S. 837 (1984).

[39] *Chevron*, 467 U.S. at 842.

[40] *Id.* at 843 n.9.

[41] *Id.* at 843.

[42] *Id.* at 844.

[43] *Id.* at 843; *see also Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 409-10 (5th Cir. 1999).

12

destruction/adverse modification standards in terms of both survival and recovery. Arguing that the regulation consequently equates the two consultation standards, Sierra Club asserts that 50 C.F.R. § 402.02 violates a cardinal principle of statutory construction—i.e., "to give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section."[44] Sierra Club argues that the ESA contemplates two separate standards and that the regulation impermissibly conflates the two consultation standards.

We are unpersuaded by this argument. The mere fact that both definitions are framed in terms of survival and recovery does not render them equivalent. Significantly, the destruction/adverse modification standard is defined in terms of actions that diminish the "*value of critical habitat*" for survival and recovery.[45] Such actions conceivably possess a more attenuated relationship to the survival and recovery of the species. The destruction/adverse modification standard focuses on the action's effects on critical habitat. In contrast, the jeopardy standard addresses the effect of the action itself on the survival and recovery of the species. The

---

[44] *Bennett v. Spear*, 520 U.S. 154, 173 (1997).

[45] 50 C.F.R. § 402.02 (emphasis added).

language of the ESA itself indicates two distinct standards;[46] the regulation does not efface this distinction.

Sierra Club also contends that the regulation "sets the bar too high" for the destruction/adverse modification standard. Sierra Club argues that the regulation's requirement that an action affect both survival and recovery conflicts with the ESA. According to Sierra Club, the ESA requires consultation where an action affects recovery alone; it is not necessary for an action to affect the survival of a species.

On this point, we are in agreement with Sierra Club. The ESA defines "critical habitat" as areas which are "essential to the conservation" of listed species.[47] "Conservation" is a much broader concept than mere survival. The ESA's definition of "conservation" speaks to the recovery of a threatened or endangered species.[48]

_____

[46] *See Greenpeace v. National Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1265 (W.D. Wash. 1999) ("Although there is considerable overlap between the two, the Act established two separate standards to be considered."); *Conservation Council for Hawai'i v. Babbitt*, 2 F. Supp.2d 1280, 1287 (D. Haw. 1998) ("[T]he ESA clearly established two separate considerations, jeopardy and adverse modification, but recognizes . . . that these standards overlap to some degree.").

[47] *See* 16 U.S.C.A. § 1532(5)(A).

[48] *Compare* 16 U.S.C.A. § 1532(3) (defining "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"), *with* 50 C.F.R. § 402.02 ("'Recovery' means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in" the ESA).

14

Indeed, in a different section of the ESA, the statute distinguishes between "conservation" and "survival."[49] Requiring consultation only where an action affects the value of critical habitat to both the recovery *and* survival of a species imposes a higher threshold than the statutory language permits.[50]

The legislative history of the ESA affirms the inconsistency of 50 C.F.R. § 402.02 with the statute.[51] A 1978 regulation defined "critical habitat" for purposes of the ESA as "any air, land or water area . . . the loss of which would appreciably decrease the likelihood of the *survival and recovery* of a listed species or a

---

[49] *See* 16 U.S.C.A. § 1533(f)(1) (stating that recovery plans should be crafted "for the conservation and survival" of endangered and threatened species); *see also Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) ("[I]dentical words used in different parts of the same act are intended to have the same meaning."); *United States Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear . . . .").

[50] Admittedly, survival is a necessary condition for recovery; a species cannot recover without survival. The mere fact that a concept such as survival is a precondition of or implicit in a statutory term does not grant it independent significance. Consider a hypothetical law protecting the rights of individuals to swim in rivers and streams of their choosing. One who prevents such activity violates the ordinance. Although the concept of "swimming" implies action by a live human being, one does not have to both stop the swimming *and* terminate the life of the swimmer to violate the statute. Yet this is the logic employed by the Services in interpreting the ESA.

[51] *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) (affirming that legislative history may be consulted in determining the Congressional intent under the first step of *Chevron* analysis).

distinct segment of its population . . . ."[52] Although Congress was aware of this regulatory interpretation of the statute,[53] it chose not to adopt this approach when it amended the ESA in 1978 to define critical habitat. Instead, Congress employed the current statutory definition, which is grounded in the concept of "conservation."[54] As a House Report accompanying a subsequent appropriations bill indicated, the 1978 amendments "significantly altered" the agency definition of critical habitat, which was phrased in terms of effects on both survival and recovery.[55] The Services' definition of the destruction/adverse modification standard in terms of survival and recovery is consequently an

---

[52] 50 C.F.R. § 402.02 (1978) (emphasis added). The 1978 regulation also contained a definition of "destruction or adverse modification" that is virtually identical to the current definition. The 1978 definition read: "a direct or indirect alteration of critical habitat which appreciably diminishes the value of that habitat for survival and recovery of a listed species." *Id.* The only salient difference between the two definitions is that the current definition refers to "*both* survival and recovery." *See* 50 C.F.R. § 402.02 (2000) (emphasis added).

[53] *See* H.R. Rep. No. 95-1625, at 7-8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9458.

[54] *See* Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, § 2, 92 Stat. 3751, 3751 (codified as amended at 16 U.S.C.A. § 1532(5)(A)). The original version of the ESA included a definition of "conservation" which is identical to the present version. Endangered Species Act of 1973, Pub. L. No. 93-205, § 3(2), 87 Stat. 884 (codified as amended at 16 U.S.C.A. § 1532(3)).

[55] *See* H.R. Rep. No. 96-167, at 5-6 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2557, 2561-62.

attempt to revive an interpretation that was rejected by Congress.[56]

We further note that 50 C.F.R. § 402.02 renders it less likely that critical habitat will be designated. Because of the higher threshold imposed by defining the destruction/adverse modification standard in terms of both survival and recovery, federal agencies would be required to consult with the Department of Interior less frequently than if the standard were defined in terms of recovery alone. Because the jeopardy standard already requires agencies to consult with the Department where their actions would affect both the survival and recovery of a species, it is less likely that the Services would discern additional benefit from designating critical habitat. Consequently, the Services are more likely to find designation "not prudent." This result is in tension with the avowed intent of Congress that a "not prudent" finding regarding critical habitat would only occur under "rare" or "limited" circumstances.[57] In practice, the Services have inverted this intent, rendering critical habitat designation the exception and

---

[56] *Cf. Runyon v. McCrary*, 427 U.S. 160, 174-75 (1976) (noting that Congress's rejection of a legislative proposal militates against interpreting a statute consistent with that rejected proposal).

[57] *See* H.R. Conf. Rep. No. 97-835, at 24 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2865; H.R. Rep. No. 95-1625, at 16-17 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9466-67; *see also Enos v. Marsh*, 769 F.2d 1363, 1371 (9th Cir. 1985) (stating that the FWS "may only fail to designate a critical habitat under rare circumstances").

not the rule.[58] The rarity of designation is attributable, in part, to the manner in which the Services have defined the jeopardy and destruction/adverse modification standards.[59]

Based on the manifest inconsistency between 50 C.F.R. § 402.02 and Congress's "unambiguously expressed intent" in the ESA,[60] we find the regulation's definition of the destruction/adverse modification standard to be facially invalid.[61]

B

---

[58] *See* S. Rep. No. 106-126, at 2, 4 (1999) (observing the infrequency of critical habitat designation in practice and noting that the "not prudent" exception was intended to be exercised "only rarely"); Thomas F. Darin, Comment, *Designating Critical Habitat Under the Endangered Species Act: Habitat Protection Versus Agency Discretion*, 24 Harv. Envt'l L. Rev. 209, 224 (2000) (noting that, by 1999, the Services had only designated critical habitat for 120 out of 1,181 listed species).

[59] *See* Pamela Baldwin, *The Role of Designation of Critical Habitat under the Endangered Species Act*, CRS Report for Congress, at 5-6 (1999) (tracing the infrequency of critical habitat designation to the Service's definition of the destruction/adverse modification standard); Darin, *supra* n.58, at 224 (noting that the "not prudent" rationale was the most common reason for not designating critical habitat and stating that the FWS employed a "strained interpretation" of that exception).

[60] *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).

[61] We emphasize that our holding applies only to the definition of "destruction or adverse modification." The remainder of 50 C.F.R. § 402.02—including the regulation's definition of "jeopardize the continued existence of"—is unaffected by our ruling.

We now turn to the substance of the 1998 decision. The district court found the 1998 decision to be valid, despite the facial conflict between 50 C.F.R. § 402.02 and the ESA. The court found that the decision was not arbitrary and capricious because "the agencies considered all of the necessary factors, which extend beyond the scope of the regulation, and articulated minimally rational conclusions that are supported by the factual record." The court further noted that the decision was based on the best scientific data available.

Sierra Club contests the court's findings, arguing that the Services' reliance on 50 C.F.R. § 402.02 went to the heart of its decision. Sierra Club contends that the agency further misinterpreted the ESA by concluding that designation of unoccupied habitat is never beneficial for threatened species. Finally, Sierra Club argues that the 1998 decision was arbitrary and capricious because the Services failed to consider the informational benefits associated with critical habitat designation. We address each of these contentions in turn.

1

In addition to our power to review agency interpretations under *Chevron*, we may review the reasonableness of an agency's decision-making process under the Administrative Procedure Act

19

(APA).[62] We reverse agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[63] Review is generally limited to the record in existence at the time the agency made its decision.[64] Our scope of review is narrow; we may not weigh the evidence in the record pro or con.[65] Our task is to ensure that the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."[66]

The district court concluded that the 1998 decision was not arbitrary or capricious, despite its reliance on a possibly invalid regulation. The court implicitly invoked the doctrine of harmless error, which the APA applies to review of agency action.[67] Agency mistakes constitute harmless error only where they "clearly had no bearing on the procedure used or the substance of decision

---

[62] *See* 5 U.S.C.A. § 706(2) (2000). The administrative record for the Services' 1998 decision is before this Court.

[63] 5 U.S.C.A. § 706(2)(A).

[64] *See* 5 U.S.C.A. § 706 (2000); *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

[65] *See State of Louisiana* ex rel. *Guste v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988).

[66] *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Verity*, 853 F.2d at 327.

[67] *See* 5 U.S.C.A. § 706 (noting that "due account shall be taken of the rule of prejudicial error").

reached."[68] This Court has affirmed that "[a]bsence of such prejudice must be clear for harmless error to be applicable."[69]

Given the extent to which 50 C.F.R. § 402.02 permeates the 1998 decision, we do not find that prejudice was clearly absent. The Services expressly found that designation of unoccupied critical habitat was necessary to the recovery, but not the survival, of the sturgeon.[70] In this instance, the invalid regulation directly informed the Services' conclusion that designation was not warranted. Moreover, the Services' evaluation of the merits of critical habitat designation was premised on the view that jeopardy consultation was "functionally equivalent" to consultation under the destruction/adverse modification standard.[71] This position was based on the fact that 50 C.F.R. § 402.02 defined both standards in terms of survival and recovery.[72] As we have concluded that the regulatory definition of the destruction/adverse modification standard is flawed, this "functional equivalence"

---

[68] *United States Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979) (quoting *Braniff Airways v. CAB*, 379 F.2d 453 (D.C. Cir. 1967)).

[69] *Id.; see also Texas v. Lyng*, 868 F.2d 795, 799 (5th Cir. 1989).

[70] *See* 63 Fed. Reg. at 9973.

[71] *See id.*

[72] *See id.*

argument is untenable.[73] The 1998 decision also considered the benefits of designation in light of existing protections outside the ESA consultation mechanism (e.g., state and federal clean water laws). However, this analysis was further guided by the "survival and recovery" threshold.

2

We note that the Services' reliance on 50 C.F.R. § 402.02 also led them to erroneous conclusions regarding the benefit of designation for threatened species. Submerged in the 1998 decision is the contention that designation would only be "beneficial" in relation to the unoccupied habitat of certain endangered species.[74] The Services reasoned that "[s]ince *threatened* species such as the Gulf sturgeon are, by definition, not currently at risk of extinction, but are rather anticipated to become so in the

---

[73] We also question the rationale underlying the entire 1998 decision—i.e., that designation is not "beneficial" to a species where it is less beneficial than other existing protections. As the Ninth Circuit observed in a recent opinion, "[n]either the Act nor the implementing regulations sanctions nondesignation of habitat when designation would be merely *less* beneficial to the species than another type of protection." *Natural Resources Defense Council v. Department of Interior*, 113 F.3d 1121, 1127 (9th Cir. 1997). However, as the ESA is ambiguous on this point, we are unprepared to conclude that the Services' interpretation is an impermissible construction of the statute. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984).

[74] *See* Decision on Designation of Critical Habitat for the Gulf sturgeon, 63 Fed. Reg. 9967, 9968-69 (Feb. 27, 1998).

foreseeable future, unoccupied critical habitat would not be immediately required for their survival."[75] This conclusion was based, in part, on the regulation's definition of the destruction/adverse modification standard in terms of both survival and recovery.

Although we find the Services' reasoning to be flawed on the preceding basis alone, we note an additional source of error: the Services' argument would effectively prevent all threatened species from receiving critical habitat designation. It is difficult to reconcile this result with the ESA, which states that critical habitat "shall" be designated for threatened, as well as endangered, species.[76] The agency's interpretation would read these provisions out of the statute.[77] In light of the preceding errors, it is of no moment that the Services may have based their conclusions on the "best scientific data available."[78] Given the extent of the Services' reliance on an invalid regulation, we conclude that the 1998 decision was arbitrary and capricious.

3

---

[75] *Id.* (emphasis added).

[76] *See* 16 U.S.C.A. §§ 1533(a)(3), (b)(6)(C); *see also Sierra Club v. Glickman*, 156 F.3d 606, 615-16 (5th Cir. 1998) (recognizing the mandatory obligation of all agencies to conserve listed species).

[77] *See Bennett v. Spear*, 520 U.S. 154, 173 (1997).

[78] *See* 16 U.S.C.A. § 1533(b)(2).

Sierra Club also contends that the Services failed to consider the informational benefits associated with critical habitat designation. Sierra Club correctly notes that, while the consultation requirement only applies to federal agencies, the ESA as a whole applies to private and state actors.[79] Critical habitat designation provides informational benefits to the public, state and local governments, and scientific organizations.[80] The ESA also contemplates the participation of these entities in the designation process.[81]

Nothing in the ESA or its accompanying regulations affirmatively requires the Services to consider these benefits when rendering a habitat decision. Although the ESA imposes on the

---

[79] *See* 16 U.S.C.A. § 1538 (prohibiting the taking of species by "any person"); 16 U.S.C.A. § 1539 (giving the Secretary the power to issue permits for incidental taking of species); 16 U.S.C.A. § 1536(d) (prohibiting the applicant for an incidental take permit from irreversibly committing resources pending consideration of the application); 16 U.S.C.A. § 1540(g) (giving private citizens the right to sue to enforce the ESA); *see also Loggerhead Turtle v. County Council*, 148 F.3d 1231, 1246 (11th Cir. 1998); *Hawksbill Sea Turtle v. Federal Emergency Mgmt. Agency*, 126 F.3d 461, 479 n.13 (3d Cir. 1997).

[80] The ESA requires the publication of a proposed rule designating critical habitat in both the *Federal Register* and a local newspaper. *See* 16 U.S.C.A. § 1533(b)(5). The Services must also notify state and local governments regarding a proposed designation. *See id.* Finally, the ESA states that the Secretary may provide notice of proposed designation "to such professional scientific organizations as he deems appropriate." *Id.*

[81] *See* 16 U.S.C.A. § 1533(b)(5)(B), (b)(5)(E); *Conservation Council for Hawai'i v. Babbitt*, 2 F. Supp. 2d 1280, 1288 (D. Haw. 1998).

Secretary the open-ended requirement that he take into account "any other relevant impact" of designation, the statute is silent as to which impacts are relevant in any given case.[82] Public participation following the notice of proposed habitat designation may provide agencies with valuable information as they prepare to render a final decision. However, this participation is not a benefit resulting from designation; it is a component of the decision-making process.

We do not deny the informational value of habitat designation. Heightened public awareness of the plight of a listed species and its habitat may facilitate conservation efforts. However, this type of informational benefit is conceivable for any rule promulgated after a period of notice and comment.[83] We are unprepared to conclude that the Service must consider this potential benefit in every instance.[84] Given the ambiguity of the ESA's description of the "other relevant impacts" warranting consideration, the Services' failure to expressly consider the informational benefits of habitat designation was not arbitrary or capricious action.[85]

---

[82] *See* 16 U.S.C.A. § 1533(b)(2).

[83] *Cf.* 5 U.S.C.A. § 553(c) (2000). It is not unreasonable to conclude that most rules would function more effectively with heightened public awareness.

[84] This Court is therefore in disagreement with the holding in *Conservation Council for Hawai'i*, 2 F. Supp. 2d at 1288.

[85] We do not find that the Services failed to "consider[ ] the relevant factors" by not considering these informational benefits. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,*

As the Services relied on an invalid regulation, however, we find that the 1998 decision was arbitrary and capricious. On remand, the Services will be given the opportunity to reconsider their decision in light of the appropriate legal standards.[86]

V

We REVERSE the decision of the district court and REMAND to the district court, with instructions to remand to the FWS and NMFS for proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

---

*Inc.*, 462 U.S. 87, 105 (1983).
The district court appears to have found that the Services took into account the informational benefits associated with designation. In the 1998 decision, the Services analyzed the benefits of critical habitat designation in light of the "informational or procedural" tasks associated with the Recovery/Management Plan for the sturgeon. *See* 63 Fed. Reg. at 9973. However, it is far from clear that the "priority tasks" outlined in the recovery plan implicated the same kind of informational benefits provided by the notice and participation provisions of the ESA.

[86] *See Federal Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason.").